AMERICAN TOTALISATOR SYSTEMS, INC. *v.* OREST T. DUBNO, COMMISSIONER OF REVENUE SERVICES (13409)

PETERS, C. J., SHEA, CALLAHAN, GLASS and COVELLO, Js.

Argued December 16, 1988—decision released March 14, 1989

*Richard K. Greenberg,* assistant attorney general, with whom, on the brief, was *Joseph I. Lieberman,* former attorney general, for the appellant (defendant).

*Scott P. Moser,* with whom, on the brief, was *H. Douglas Bailey* for the appellee (plaintiff).

*Callahan, J.* This case is one of four related appeals from sales and use tax assessments that were consolidated for trial in the Superior Court and subsequently appealed to this court. The other three appeals were decided on this same date. See *American Totalisator Co.* v. *Dubno,* 210 Conn. 401, 555 A.2d 414 (1989). As did the first of those appeals, this appeal arises out of contracts between American Totalisator Company, Inc. (AmTote), and the state of Connecticut. These contracts provided that AmTote establish and operate the state's initial teletrack, off-track betting and daily lottery ventures. This case is addressed separately because

it concerns personnel services rather than personal property and because the trial court reached a different result in this case than in the others.

The basic facts are not in dispute. The plaintiff in this case, American Totalisator Systems, Inc. (Systems), and AmTote are both wholly owned subsidiaries of General Instrument Corporation. In 1973, AmTote entered into a contract with the state to establish and operate the state's teletrack and off-track betting systems. In 1977, it contracted with the state to establish and operate the daily lottery. Because AmTote did not directly employ sufficient personnel to render all the services required by its contracts with the state, it used employees of Systems, its sister corporation, to fulfill its contractual obligations. The arrangement between Systems and AmTote arose out of considerations of business policy and convenience; Systems did not hold itself out, advertise or operate as a personnel agency in the public domain and it supplied employees only to AmTote and to no other entity. Systems was reimbursed for its employees' services to AmTote by a fee equal to 100 percent of its employees' salaries plus 5 percent for overhead expenses.

In 1982, the commissioner of revenue services (commissioner) assessed a sales tax deficiency against Systems in the amount of $283,080.98 for the period January 1, 1976, through February 28, 1982.[1] That assessment was based on a determination by the commissioner that Systems was an agency providing personnel services at retail within the meaning of General Statutes § 12-407 (2) (i) (C)[2]

[1] The commissioner also assessed a penalty in the amount of $28,453.31.

[2] General Statutes (Rev. to 1987) § 12-407 (2) (i) (C) provides in pertinent part: "(2) 'Sale' and 'selling' mean and include . . . (i) the rendering of certain services for a consideration, exclusive of such services rendered by an employee for his employer, as follows . . . (C) services by collection agencies, employment agencies and agencies providing personnel services. . . . "

and (3).[3] Systems petitioned for a reassessment of the sales tax deficiency under General Statutes§ 12-418 (1)[4] and requested an oral hearing under General Statutes § 12-418 (2).[5] After the oral hearing, the commissioner confirmed the assessment against Systems. Subsequently, Systems appealed to the Superior Court, pursuant to General Statutes § 14-422.[6]

---

[3] General Statutes § 12-407 (3) provides: "DEFINITIONS. Whenever used in this chapter . . . .

"(3) 'Retail sale' or 'sale at retail' means and includes a sale for any purpose other than resale in the regular course of business of tangible personal property or a transfer for a consideration of the occupancy of any room or rooms in a hotel or lodging house for a period of thirty consecutive calendar days or less, or the rendering of any service described in any of the subdivisions of subsection (2) of this section. The delivery in this state of tangible personal property by an owner or former owner thereof or by a factor, if the delivery is to a consumer pursuant to a retail sale made by a retailer not engaged in business in this state, is a retail sale in this state by the person making the delivery. He shall include the retail selling price of the property in his gross receipts."

[4] General Statutes § 12-418 (1) provides: "REASSESSMENT. (1) PETITION FOR REASSESSMENT. Any person against whom an assessment is made under section 12-415 or 12-416 or any person directly interested may petition for a reassessment within thirty days after service upon such person of notice thereof. If a petition for reassessment is not filed within the thirty-day period, the assessment becomes final at the expiration of the period."

[5] General Statutes § 12-418 (2) provides: "ORAL HEARING. If a petition for reassessment is filed within the thirty-day period, the commissioner shall reconsider the assessment and, if the person has so requested in his petition, shall, in his discretion, grant the person an oral hearing and shall give him ten days' notice of the time and place of the hearing. The commissioner may continue the hearing from time to time, as may be necessary, and may assign the conduct of such hearing to his representative."

[6] "[General Statutes] Sec. 12-422. APPEAL. Any taxpayer aggrieved because of any order, decision, determination or disallowance of the commissioner of revenue services under section 12-418, 12-421 or 12-425 may, within one month after service upon the taxpayer of notice of such order, decision, determination or disallowance, take an appeal therefrom to the superior court for the judicial district of Hartford-New Britain, which shall be accompanied by a citation to the commissioner of revenue services to appear before said court. Such citation shall be signed by the same author-

The Superior Court determined that sales tax deficiencies were incorrectly assessed against Systems because Systems' transactions with AmTote were not retail sales as defined by § 12-407 (3). The court found instead that the services of Systems' employees were purchased by AmTote for "resale" to the state, thus taking the transactions out of the definition of retail sales.[7] The trial court consequently determined that the transactions were not subject to the imposition of a sales tax. The commissioner, however, contends that AmTote did not resell the services of Systems' employees to the state but rather used those services itself to fulfill its teletrack, off-track betting and daily lottery contracts. We agree with the commissioner and conclude that the sales of Systems' employees' services to AmTote were not sales for resale but rather retail sales subject to the imposition of a sales tax.

Our conclusion is based on the same rationale that underlay our holding in *American Totalisator Co.* v. *Dubno,* supra, that is, that the intention of both the state and AmTote, as manifested by their contracts, was that AmTote provide the state with equipment and

ity, and such appeal shall be returnable at the same time and served and returned in the same manner, as is required in case of a summons in a civil action. The authority issuing the citation shall take from the appellant a bond or recognizance to the state of Connecticut, with surety to prosecute the appeal to effect and to comply with the orders and decrees of the court in the premises. Such appeals shall be preferred cases, to be heard, unless cause appears to the contrary, at the first session, by the court or by a committee apppointed by it. Said court may grant such relief as may be equitable and, if such tax has been paid prior to the granting of such relief, may order the treasurer to pay the amount of such relief, with interest at the rate of six per cent per annum, to the aggrieved taxpayer. If the appeal has been taken without probable cause, the court may tax double or triple costs, as the case demands; and, upon all such appeals which are denied, costs may be taxed against the appellant at the discretion of the court, but no costs shall be taxed against the state."

[7] If, as the plaintiff claims, the personnel services were then "resold" to the state, an exempt entity under General Statutes § 12-412 (1), such sale would not be subject to the imposition of a sales tax.

personnel to establish and operate the state's embryonic wagering systems. The agreements clearly indicate that the state did not contract with AmTote to purchase personnel services per se. See *Fusco-Amatruda Co.* v. *Tax Commissioner,* 168 Conn. 597, 601, 362 A.2d 847 (1975). Instead, it contracted to have AmTote initiate and operate the wagering systems it desired and AmTote, under the contracts, was obligated to supply the necessary personnel to do so. "The court must look to the intention of the parties to the contract to determine whether the items in a contract are held for resale or were purchased for a different purpose." *White Oak Corporation* v. *Department of Revenue Services,* 198 Conn. 413, 422, 503 A.2d 582 (1986). "That intention is to be ascertained from the language used, interpreted in the light of the situation of the parties and the circumstances surrounding them." *United Aircraft Corporation* v. *O'Connor,* 141 Conn. 530, 538, 107 A.2d 398 (1954). The personnel services furnished by Systems to AmTote, while necessary, were incidental to the primary purpose of AmTote's contracts with the state and were utilized by AmTote, itself, in performing those contracts. *White Oak Corporation* v. *Department of Revenue Services,* supra, 422–23; *Dresser Industries, Inc.* v. *Lindley,* 12 Ohio St. 3d 68, 69, 465 N.E.2d 430 (1984). The services were not purchased from Systems and then "resold" to the state by AmTote as Systems contends. Consequently, the sale of Systems' personnel services to AmTote was a "retail sale" as defined by § 12-407 (3). *White Oak Corporation* v. *Department of Revenue Services,* supra, 423.

Systems has, however, urged an alternate ground for sustaining the judgment of the trial court. It argues that it is not an "[agency] providing personnel services" as contemplated by § 12-407 (2) (i) (C) and is, therefore, not subject to the imposition of a sales tax on the sale

of its employees' services to AmTote. It contends that the "agencies" intended by the legislature to be subject to sales taxes for "providing personnel services" are those "agencies" that advertise and hold themselves out to the public to be in the business of placing their employees with other businesses and industry. Systems claims that the statute was never intended to include within its parameters the sale of the services of employees of one wholly owned subsidiary of a parent corporation to another.[8] We disagree.

Absent a specific exemption, transactions between affiliated corporations are subject to the imposition of a sales tax. *Ex Parte Capital City Asphalt, Inc.,* 437 So. 2d 1291 (Ala. 1983); *Superior Coal Co.* v. *Department of Finance,* 377 Ill. 282, 291, 36 N.E.2d 354 (1941); *Hilton Hotels Corporation* v. *Traigle,* 360 So. 2d 245, 246–47 (La. App. 1978); *Central Cooling & Supply Co.* v. *Director of Revenue,* 648 S.W.2d 546, 548 (Mo. 1982); *Prospect Dairy, Inc.* v. *Tully,* 53 App. Div. 2d 755, 384 N.Y.S.2d 264 (1976); 68 Am. Jur. 2d, Sales and Use Tax § 97; see also annot., 64 A.L.R.2d 769. Therefore, if Systems was an "[agency] providing personnel services" its transactions with AmTote were taxable despite the affiliation of the two corporations unless there exists an applicable exemption. There is no definition of the word "agency" in either the statutes concerning the sales and use tax or the regulations. The Random House Dictionary of the English Language (2d Ed.) p. 37, however, defines "agency" as: "An organization, company, or bureau that provides some service to another." Systems in its relations with AmTote fits within that definition. Moreover, we can find nothing in the statutes or the regulations that would dictate reading § 12-407 (2) (i) (C) to require that Systems has held itself out to the public as a person-

---

[8] Systems cites no authority for this proposition other than the legislative history of Public Acts, Spec. Sess., July, 1987, No. 1. Footnote 10, infra.

nel agency before its transactions with AmTote were subject to the imposition of a sales tax.

Systems argues further, however, that the commissioner's own regulations support its contention that its transactions with AmTote were not taxable because those regulations define personnel services to mean "furnishing temporary or part-time help to others by means of employing such temporary or part-time help directly." Regs., Conn. State Agencies § 12-426-27 (b) (3) (c).[9] Systems claims that its employees worked for AmTote "on an exclusive, permanent, full time and ongoing basis" and hence that it did not supply AmTote with "personnel services" as envisioned by § 12-407 (2) (i) (C) or the regulations. The problem with this argument is that the trial court specifically found that Systems' employees "were not to be permanent" and that its agreement with AmTote "was to provide temporary help." Other than the assertion to the contrary in its brief, Systems has not challenged that finding on appeal. Its argument in this regard is therefore without merit.

Finally, Systems contends that the enactment of Public Acts, Spec. Sess., July, 1987, No. 1,[10] was a clear

---

[9] The Regulations of Connecticut State Agencies, § 12-426-27 (b) (3) (c) provides: " ENUMERATED SERVICES. . . . (3) Collection services; employment and personnel services. . . . (c) Personnel services mean and include furnishing temporary or part-time help to others by means of employing such temporary and part-time help directly."

[10] Public Acts, Spec. Sess., July, 1987, No. 1, §§ 1 and 2, provide: "July Special Session, Public Act No. 87-1

"AN ACT ESTABLISHING (1) EXEMPTION FROM SALES TAX FOR CERTAIN SALES OF SERVICES BETWEEN PARENT COMPANIES AND WHOLLY-OWNED SUBSIDIARIES, (2) A RESIDENTIAL PROPERTY TAX REVALUATION RELIEF FUND AND (3) A PROGRAM ALLOWING GRADUAL INCREASES IN ASSESSED VALUES FOLLOWING REVALUATION.

"Section 1. Section 12-412 of the general statutes is amended by adding subsection (59) as follows:

"(NEW) (59) Subject to the provisions of section 2 of this act, sales of any of the services enumerated in subdivision (i) of subsection (2) of sec-

signal from the legislature that it never intended that sales taxes be levied on transactions relating to business services between wholly owned subsidiaries of the same parent corporation. That act did, in fact, create such an exemption from the sales and use tax for corporations so affiliated and made that exemption retroactive to July 1, 1982. Although Systems recognizes that its transactions with AmTote predated July 1, 1982, it argues that it should have the benefit of the

tion 12-407, in the period July 1, 1987 to June 30, 1988, inclusive, which are rendered for a corporation affiliated with the corporation rendering such service in such manner that (1) either corporation in such transaction owns or controls either directly or indirectly not less than one hundred per cent of the capital stock of the other corporation or (2) either corporation in such transaction is owned or controlled either directly or indirectly by interests which own or control either directly or indirectly not less than one hundred per cent of the capital stock of the other corporation, provided any such transaction is rendered for purposes of expense allocation and not for purposes of profit for the company rendering such service.

"Sec. 2. (NEW) (a) The exemption from sales tax allowed in accordance with section 1 of this act shall be applicable to sales of certain services as provided in said section 1, in the period July 1, 1987 to June 30, 1988, inclusive, and additionally, with respect to such sales of services rendered in the period July 1, 1982 to June 30, 1987, inclusive.

"(b) Any sales tax which has been paid to the state as a result of such sales of services rendered in said period July 1, 1982 to June 30, 1987, inclusive, shall be subject to refund to the corporation from which such payment was received. The commissioner of revenue services shall establish a procedure for submission of claims related to such refunds, including preparation of a form appropriate for inclusion of such information as may be necessary in determining the validity of such claim. When such form is available for distribution the commissioner shall implement a notification procedure for corporations that may be eligible for such refund. Such notification shall include dates for commencement and termination of a period, not exceeding ninety days as established by the commissioner, during which such claims for refund may be submitted. The commissioner shall notify each applicant for refund by mail as to approval or disapproval of such claim. Refund of tax to any taxpayer whose application is approved shall be made not later than June 30, 1988. Any taxpayer whose application for refund has been disappproved may apply to the commissioner for a hearing in the manner allowed under section 12-421 of the general statutes for any taxpayer aggrieved by action of the commissioner in fixing the amount of any tax."

exemption because the legislative history[11] of the act reveals that the commissioner has all along been misinterpreting § 12-407 (2) (i) (C) by applying it to corporations affiliated as are Systems and AmTote. Further, it contends that the July 1, 1982 cutoff date was only arrived at because of misinformation supplied to the legislature by the commissioner.[12]

That argument has some facial appeal. Public Acts, Spec. Sess., July, 1987, No. 1, however, by its terms applies only to transactions between wholly owned subsidiaries of a parent corporation that are "for purposes of expense allocation and not for purposes of profit for the company rendering such services." In this case the trial court explicitly found that: "The contract between AmTote and Systems appears to provide that Systems make a profit, albeit small . . . . The court *cannot find* that the transaction between AmTote and Systems was rendered [sic] for purposes of expense allocation

---

[11] See 30 S. Proc., Pt. 16, 1987 Spec. Sess., pp. 45–78; 30 H.R. Proc., Pt. 37, 1987 Spec. Sess., pp. 129–211.

[12] Systems refers to the following:

"REP. [Thomas D.] RITTER: (2nd)

"One small question about legislative intent, also. Whether it is in his opinion . . . will it tend to treat tax payers equitably with respect to tax years open to assessments of tax prior to July 1, 1982, but for which no tax has been paid?

"Through you, Mr. Speaker . . .

"REP. [Ronald L.] SMOKO: (91st)

"Through you, Mr. Speaker. We picked July 1, '82 because Revenue Services has indicated that their records only go back to July 1, '82. If there are any audits in existence that would be called into question by the interpretation we take here, it will be my opinion that they would be rendered moot, as this Legislature has made its position very clear through the action we will be taking today, under retroactive application of the business services tax in instances like this.

"I would say that if there exist any audits prior to July 1, 1982, that are in question, that if I was Commissioner of Revenue Services, I would say that the Legislature didn't intend it to be interpreted this way, so we are not going to pursue it anymore. . . . " 30 H.R. Proc., Pt. 37, 1987 Spec. Sess., pp. 147–48.

and not for purposes of profit to Systems." (Emphasis added.) The basis of that factual finding has not been questioned on appeal. Therefore, even if we were inclined to construe the act as requested, it would be of no moment to Systems.

There is error in the trial court's conclusion that the transactions between Systems and AmTote were not subject to the imposition of a sales tax, and the matter is remanded to the trial court for further proceedings.

In this opinion the other justices concurred.